THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DIANA G. RADCLIFF, Defendant-Appellant.

Fifth District    No. 5—98—0378

Opinion filed June 18, 1999.

Brian L. Ransom, of Belleville, for appellant.

James Creason, State's Attorney, of Salem (Norbert J. Goetten, Stephen E. Norris, and Kevin Sweeney, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

Defendant, Diana G. Radcliff, was charged with possession of more than 15 grams of cocaine with intent to deliver, possession of less than 15 grams of heroin, and possession of less than 200 grams of amphetamines. Defendant was found guilty at a jury trial of all three charges. Defendant appeals.

The relevant facts are as follows. On May 28, 1996, defendant was

involved in a one-vehicle automobile accident in which her vehicle was wrecked and she was seriously injured. Subsequent to the accident, two packets containing amphetamines were discovered in her vehicle. Cocaine and heroin were found on defendant's person after her clothes were cut off of her at the hospital. Prior to the trial, defendant moved to suppress evidence of the drugs that were recovered.

On December 18, 1996, a hearing was held on the motion to suppress. Defendant testified that on May 28, 1996, she was injured in an automobile accident and taken to Salem Hospital. There is no dispute that defendant was not asked for permission to search her vehicle, nor did she give such permission. At the time of the accident, defendant was wearing an off-white, linen "fanny pack" that was fastened around her waist. The fanny pack had a zippered compartment, as well as two snap pockets. Defendant was never asked for permission to search the fanny pack.

Robert Shehorn, lead paramedic for Campbell Superior Ambulance Service, was working on May 28, 1996, and was called to the scene of defendant's accident. Shehorn testified that he did not work for the police or take orders from them. Upon his arrival at the scene of the accident, Shehorn observed a severely damaged white Camaro sitting at an angle on a driveway. Shehorn stated that the vehicle had apparently left the road, hit a concrete tile at the end of the driveway, and jumped the culvert. The front passenger's door of the vehicle was open, with defendant lying partly in and partly out of the vehicle. Shehorn immediately went to the patient and noticed that she was conscious but that she was confused, disoriented, and in pain. Defendant had several facial injuries that involved excessive bleeding. She had broken her dentures and had several lacerations around her mouth. Defendant also injured her left ankle and right wrist. The paramedics controlled defendant's bleeding, immobilized her, put her on oxygen and an intravenous tube, and also put her on a life-pack monitor due to a possible chest injury. Defendant's condition was considered stable but serious.

Douglas Krutsinger, accident reconstructionist for the Illinois State Police, arrived as defendant was being put into the ambulance. Krutsinger assisted Shehorn in attempting to find identification for defendant. They found a vehicle registration and money, but no driver's license or other personal identification. Shehorn found a baggie in defendant's car with some residue on it, but thought nothing of it and tossed it aside.

Defendant was transported to Salem Hospital's emergency room. Nurses Juanita Green and Cindy Spencer assisted the paramedics and took defendant to the major trauma room, where Shehorn and the

nurses cut her clothing off of her. Shehorn saw a small brown vial pinned under one of defendant's bra straps and a bag of white substance pinned under the other bra strap. Shehorn then noticed that defendant had a fanny pack around her waist, where it had previously been concealed by her blouse. Darren Davis, another emergency medical technician, unzipped the fanny pack in an effort to find some identification for defendant. Shehorn stated that it was not standard practice to assume that the driver of the vehicle is the owner of the vehicle when they find a vehicle registration as they did in this case. Shehorn testified that they generally continue to search until they find a driver's license or other form of personal identification. Inside the fanny pack, Davis found a driver's license. Davis also discovered a ziplock bag containing white powder and other containers with white substances in them. Shehorn stated that he believed that the bags in the fanny pack contained cocaine. Shehorn and Green took the fanny pack and its contents and the items found underneath defendant's bra straps and locked them in the narcotics cabinet at the hospital. Green later turned them over to Krutsinger. Defendant was then transported to a St. Louis hospital by helicopter that night.

Davis's, Green's, and Krutsinger's testimonies were in accord with Shehorn's testimony. Krutsinger believed that defendant was driving under the influence of alcohol or drugs because her eyes "looked like they were dilated" and he thought that they looked "strange." Krutsinger agreed that he looked in defendant's vehicle for identification but found nothing but a vehicle registration. Since it was dark, he used a flashlight. Krutsinger found money and asked Shehorn to gather up the bills. Krutsinger then ran a registration check on the vehicle and got the name and address of its owner. Defendant was then taken to the hospital.

Since defendant's vehicle was damaged and could not be moved without a tow, Krutsinger did an inventory search of the vehicle before it was towed, as required by written policy of the Illinois State Police. Krutsinger stated that there was a lot of clothing and trash strewn about the interior of the vehicle. At approximately 10 p.m., Krutsinger received a message from the Salem police department's dispatcher that drugs had been discovered on defendant's person at the hospital. Krutsinger told the dispatcher to contact the nurses at the hospital and see that the drugs were secured. Krutsinger then continued the inventory of the vehicle and, in the crack between the top and bottom of the driver's seat, found a plastic bag containing a light brown substance. He then seized the bag and waited until the vehicle was towed away by a towing company. Krutsinger then went to the hospital and met Green. She gave Krutsinger the fanny pack and the items found on defendant's clothing.

The next day, Krutsinger went to the lot where defendant's vehicle had been towed. Krutsinger wanted to complete the inventory search in the daylight because the original search was cursory due to lighting and other conditions. It was Krutsinger's policy to photograph vehicles involved in accidents causing severe injuries. Krutsinger could see, in plain view from outside of the vehicle, a small bag on the floor of the vehicle under the front edge of the driver's seat. The small bag contained brown material, which Krutsinger believed could be a controlled substance. It was then seized and inventoried.

Subsequent to the hearing on the motion to suppress, the trial court ruled that the actions of the medical personnel in searching defendant and her fanny pack for identification and medication were reasonable. The court stated that this was especially true considering the fact that defendant sustained serious and debilitating injuries which caused her to be unable to communicate with the people that were responsible for treating her. The trial court denied the motion to suppress, specifically ruling that the search was not for contraband but to save defendant's life.

Defendant then filed a motion to reconsider, claiming that before the trial court ruled on the motion to suppress, it spent only two to three minutes to look at 12 precedents submitted by defense counsel. The trial court agreed that it had spent only "a few minutes looking through the headnotes of those decisions." The trial court explained, however, that it did read the headnotes of the cases and that they were not on point factually since they involved situations different from those existing when defendant was in the emergency room. The court denied the motion to reconsider.

On July 7, 1997, a jury trial was held in this case. The testimony at trial was substantially similar to the testimony on the motion to suppress. At trial, Shehorn did not identify the items of contraband that he saw on defendant's person and in defendant's vehicle. Shehorn stated that while he was looking for defendant's identification in her vehicle, he saw People's exhibit 1, a baggie containing a brown substance. He did not know what it was and threw it aside. Shehorn reiterated that he assisted in removing defendant's clothing at the hospital and that they discovered People's exhibit 2, a small brown vial containing liquid, which was attached to defendant's left bra strap, and People's exhibit 3, a small bag containing white powder, which was attached to defendant's right bra strap. A beige fanny pack was also discovered, which was strapped around defendant's waist underneath her blouse. Shehorn stated that Davis removed the fanny pack, unzipped it, and discovered People's exhibit 4, a bag containing white powder, and People's exhibit 5, a larger bag containing a white

substance. Davis also found defendant's driver's license and $200. Green's testimony was the same as Shehorn's and Davis's testimonies and was the same as her testimony on the motion to suppress.

Krutsinger's testimony was generally similar to his testimony on the suppression motion. He also gave additional details regarding the first time that he looked into defendant's vehicle. This was while defendant was still at the scene of the accident. He stated that he was looking for identification. Krutsinger testified that he observed a baggie with the corner cut out of it that contained a brown substance. He did not seize it at that time. Subsequent to the time that Krutsinger discovered that drugs had been found on defendant's person, he took *the baggie from the car. That container is People's exhibit 1.* Krutsinger received People's exhibits 2, 3, 4, and 5 from Green at the hospital and inventoried them. While Krutsinger was going through the fanny pack and inventorying the drugs, defendant's husband arrived at the hospital. Krutsinger returned the empty fanny pack, the $200, and the cigarette case to defendant's husband. The following day, Krutsinger went to where defendant's vehicle had been towed, in order to complete his inventory search and to photograph the vehicle. Krutsinger could see, from outside of the vehicle, People's exhibit 6, a baggie with brown residue. Since Krutsinger could see the baggie under the driver's seat, he seized it. He took it and the other suspected narcotics to the District 12 vault.

Michael Cravens, forensic scientist for the Illinois State Police, tested People's exhibits 1 through 6 and determined the following: (1) People's exhibit 1, discovered on the driver's seat of defendant's vehicle, was 4.9 grams of a substance containing amphetamines; (2) People's exhibit 2, found pinned to defendant's left bra strap, was 1.1 grams of a substance containing heroin; (3) People's exhibit 3, found pinned to defendant's right bra strap, was 2.5 grams of a substance containing cocaine; (4) People's exhibit 4, found in defendant's fanny pack, was 6.2 grams of a substance containing cocaine; (5) People's exhibit 5, found in defendant's fanny pack, was 18.1 grams of a substance containing cocaine; and (6) People's exhibit 6, found on the floor of defendant's vehicle under the front of the driver's seat, was 1.9 grams of a substance containing amphetamines.

Thomas Staley, sergeant with the Illinois State Police, testified that he is currently assigned to the Southern Illinois Drug Task Force (Task Force). Staley said that he had been involved in more than 500 undercover drug operations. Staley testified that the purpose of the Task Force is to identify individuals that sell quantities of illegal drugs and to initiate purchases from them, thereby enabling the law enforcement officers to arrest them. Staley stated that 26.8 grams of cocaine,

as was discovered on defendant's person, was a large amount of cocaine and, based on his personal experience, he would not believe that it was for personal use. Cocaine for personal use would be approximately 3.5 grams. The cocaine found on defendant would sell for approximately $2,600, or $100 per gram. After hearing all of the testimony, the jury found defendant guilty of possession of heroin, possession of amphetamines, and possession of more than 15 grams of cocaine with intent to deliver.

At defendant's sentencing hearing, it was revealed that defendant had two prior felony convictions. Both convictions occurred in 1987; they were for possession of a controlled substance and possession of more than 500 grams of cannabis. Additionally, William Kruger, of the Illinois State Police, testified at the sentencing hearing that on August 23, 1996, when defendant was apparently out on bond in this case, he saw defendant asleep at the wheel of her vehicle on Interstate 70 in Effingham County. She had pulled her vehicle over to the side of the road and had her emergency flashers on. Two packets containing small amounts of cocaine were concealed in defendant's vehicle, and $6,890 in cash was found in her purse.

After hearing all of the evidence, the trial court sentenced defendant to 10 years in custody for possession of cocaine with intent to deliver, three years in custody for possession of heroin, and three years in custody for possession of amphetamines, with all sentences to be served concurrently. Defendant had previously pleaded guilty to driving under the influence because cocaine was discovered in her system at the hospital. The prosecution decided to dismiss that charge.

Defendant filed a timely notice of appeal.

■ Initially, defendant argues that the trial court violated her due process rights when only the headnotes of the cases submitted by defendant were reviewed at the suppression hearing, rather than the actual text of those opinions. Defendant has not cited any precedent or other authority in support of her due process argument. Hence, pursuant to Supreme Court Rule 341(e)(7) (155 Ill. 2d R. 341(e)(7)), defendant has waived this argument on appeal. In any event, the argument is without merit. The trial court need not read every word of every case cited during oral argument. Many such cases will stand for propositions of law that are not in dispute, and others might not be relevant to the issues in the case. The trial court explained that it read the headnotes to the cases that were submitted by the defense and that none of those cases dealt with similar facts or with the kind of circumstances we have in this case. We do not believe that the suppression ruling should be disturbed on this basis.

The trial judge has broad discretion in controlling the scope of

argument. A trial judge may even deny a motion for a new trial without hearing argument by counsel. See *People v. Sally*, 17 Ill. 2d 578, 586, 162 N.E.2d 396, 400 (1959). The trial judge, in an appropriate case, may even deny a motion for a directed verdict without hearing argument. See *People v. Withers*, 87 Ill. 2d 224, 228-29, 429 N.E.2d 853, 855 (1981).

In this case, defendant submitted four cases to show that the search of defendant's clothing and fanny pack at the hospital was unlawful. See *Arkansas v. Sanders*, 442 U.S. 753, 61 L. Ed. 2d 235, 99 S. Ct. 2586 (1979) (distinguishable because no private search preceded the government search); *People v. Hamilton*, 74 Ill. 2d 457, 386 N.E.2d 53 (1979) (distinguishable since no one told the police that the briefcase had been opened, nor did medical personnel tell the police that it contained illegal drugs); *People v. Tyler*, 210 Ill. App. 3d 833, 569 N.E.2d 240 (1991) (distinguishable because no private search preceded the government search); *People v. Redmond*, 73 Ill. App. 3d 160, 390 N.E.2d 1364 (1979) (distinguishable because no private search preceded the government search). The trial judge determined that none of these cases involved a medical emergency where a badly injured person was searched in order to determine her identity and possible medications. The other four cases that were cited by defense counsel were intended to show that the searches of defendant's vehicle violated the fourth amendment. See *People v. Bayles*, 82 Ill. 2d 128, 411 N.E.2d 1346 (1980); *People v. Jones*, 102 Ill. App. 3d 238, 429 N.E.2d 1094 (1981); *People v. Rinaldo*, 80 Ill. App. 3d 433, 399 N.E.2d 1027 (1980); *People v. Emert*, 1 Ill. App. 3d 993, 274 N.E.2d 364 (1971). None of those cases, however, involved a valid inventory search. The trial judge in the instant case determined that the search was legal because it was justified by exigent circumstances created by a medical emergency and none of defendant's precedents dealt with such a situation. Hence, when an attorney submits cases to the court, it may review and examine those precedents only to the extent that they are relevant to its decision. The trial court did so in this case, and we cannot find that it abused its discretion when it determined that they were not relevant and that it was not necessary to read the entire text of those decisions.

Defendant contends that the illegal search and seizure took place after the cocaine and heroin had been lawfully discovered and confiscated by medical personnel. Defendant claims that even though the nurses and paramedics had already discovered cocaine and heroin on defendant's body and more cocaine in the fanny pack, the illegal search occurred when the medical personnel turned the fanny pack and all of the illegal drugs over to Krutsinger and he opened the fanny pack without a warrant. We disagree.

■ It is important to note that it is well-settled law that searches by private individuals do not come within the scope of the fourth amendment. See *People v. Carlile*, 234 Ill. App. 3d 1063, 1065-66, 600 N.E.2d 916, 918 (1992). "A 'search,' as contemplated by the fourth amendment to the United States Constitution, occurs when an expectation of privacy considered reasonable by society is infringed." *People v. Mannozzi*, 260 Ill. App. 3d 199, 203, 632 N.E.2d 627, 630 (1994). If, however, the inspection by the police does not intrude upon a *legitimate* expectation of privacy, there is no "search" subject to the warrant clause of the fourth amendment. See *Illinois v. Andreas*, 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319, 3324 (1983).

■ The State cites the *Andreas* opinion where customs inspectors examined a table shipped from India and discovered hashish inside. The table and its shipping container were resealed and delivered to the defendant. The defendant was arrested and the table was seized and reopened without a warrant. The *Andreas* court ruled that the defendant lost any reasonable expectation of privacy in the table once it was lawfully inspected and contraband was discovered; therefore, no search occurred under the fourth amendment when the table was later seized and cut open. The *Andreas* opinion has been followed by reviewing courts in Illinois. See *Mannozzi*, 260 Ill. App. 3d at 203, 632 N.E.2d at 631; *People v. Uran*, 157 Ill. App. 3d 294, 299, 510 N.E.2d 610, 613 (1987). The Illinois Supreme Court has also determined that once property has been lawfully seized, a subsequent inspection of it does not amount to an illegal search. See *People v. Richards*, 94 Ill. 2d 92, 445 N.E.2d 319 (1983).

Although defendant cites numerous precedents to support her position, only one of them involves a situation where contraband was discovered by a private individual and then later inspected by police. See *People v. Hamilton*, 74 Ill. 2d 457, 386 N.E.2d 53 (1979). In *Hamilton*, the defendant was injured in an automobile accident, and an orderly at the hospital looked into his briefcase and saw illegal drugs. The police later seized the briefcase and the heroin inside. The Illinois Supreme Court determined that the evidence should have been suppressed because the hospital orderly did not seize the drugs or report the discovery to the police. Hence, the Illinois Supreme Court determined that the seizure of the briefcase could not be justified as a private search. The *Hamilton* decision is distinguishable from the facts of the instant case.

Subsequent to the *Andreas* decision, the United States Supreme Court reiterated in *United States v. Jacobsen*, 466 U.S. 109, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984), that once a private party has "searched" a container, a defendant has no legitimate expectation of privacy in

the contents of that container. Specifically, in *Jacobsen*, the employees of a private freight carrier observed a white powdery substance, originally concealed within eight layers of wrappings, during their examination of a damaged package. The employees notified a federal agent, who removed a trace of the powder and subjected it to a chemical test and determined that it was cocaine. The question presented to the court in *Jacobsen* was whether the fourth amendment required the agent to obtain a warrant before testing the powder in order to determine whether it was cocaine. The Court determined that the fourth amendment did not require the Drug Enforcement Administration to obtain a warrant before testing the white powder. In so holding, the *Jacobsen* court stated that the fourth amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated. The Court stated that although the powder itself was not in "plain view" because it was enclosed in several containers and covered with papers, it was a virtual certainty that nothing else of significance was in the package and that a manual inspection of the tube and its contents would not tell the agent anything more than he already had been told. The Court emphasized that "[t]he agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." *Jacobsen*, 466 U.S. at 119-20, 80 L. Ed. 2d at 98, 104 S. Ct. at 1660. The court went on to note that the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. Since it infringed no *legitimate* expectation of privacy, it was not a "search" within the meaning of the fourth amendment. See *Jacobsen*, 466 U.S. at 120, 80 L. Ed. 2d at 98-99, 104 S. Ct. at 1660. The Court agreed that while the agents' assertion of dominion and control over the package and its contents did constitute a "seizure," that seizure was not unreasonable. The Court emphasized that since it was apparent that the tube and plastic bags contained contraband and little else, the warrantless seizure was reasonable. *Jacobsen*, 466 U.S. at 121, 80 L. Ed. 2d at 99, 104 S. Ct. at 1661. "[I]t is well settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." *Jacobsen*, 466 U.S. at 121-22, 80 L. Ed. 2d at 99, 104 S. Ct. at 1661 (cases cited therein).

A case that is strikingly similar to the instant case is *State v. Gans*, 454 So. 2d 655 (Fla. Dist. Ct. App. 1984), which follows the same line of reasoning as that used by the *Jacobsen* court. In *Gans*, the defendant was injured in an automobile accident and taken to the

emergency room in a semiconscious state, unable to answer any questions. Judy Bittner, a secretary at the hospital, was required to attempt to identify patients in such a state and note any medical history. She searched the defendant's personal belongings and discovered, among other things, a small vial containing white powder. Another secretary who was assisting noted that the powder looked like cocaine. They reported their suspicions to a registered nurse and then reported it to the police. Bittner sealed the defendant's property in a brown envelope and locked it in a drawer in the treatment area. A police officer arrived at the hospital, and Bittner gave her the envelope. The police officer opened the envelope without a search warrant and removed the vial. The contents of the vial were later tested at police headquarters and positively identified as cocaine. The *Gans* court noted that Bittner discovered the cocaine while performing her hospital duties, and the court stated, "[H]er call to the police was prompted only by general concern which we hope most law-abiding citizens feel when confronted by an unlawful act." *Gans*, 454 So. 2d at 656-57. It was clear that Bittner was not acting as a police agent and that the hospital did not have an agreement with the police to search patients for drugs. See *United States v. Barry*, 673 F.2d 912 (6th Cir. 1982). The *Gans* court emphasized that when Bittner gave the envelope to the police officer and the officer opened it, "no additional constitutional right was violated because [the police officer] *** did not exceed the scope of the private search." *Gans*, 454 So. 2d at 657. The *Gans* court cited the *Jacobsen* decision and noted again that a government search that is prompted by a private one and does not exceed the scope of the private search does not violate any constitutional rights because at that point the party's expectation of privacy has already been frustrated. The *Gans* court stated that the police officer's act of taking the envelope from Bittner and opening it was a seizure. However, it was not unreasonable because Gans had no legitimate expectation of privacy in the content of his pockets, given the earlier private search. Accord *State v. Bishop*, 43 Wash. App. 17, 714 P.2d 1199 (1986) (court held that police officer's reopening of folded packets seized by hospital security personnel from mouthpiece of telephone in the defendant's hospital room did not violate defendant's fourth amendment rights); *United States v. Bulgier*, 618 F.2d 472 (7th Cir. 1980) (court held that the reopening and reinspection of the contents of a container by or in the presence of government authorities following a private search of the same container does not constitute a separate independent search requiring a warrant); *Commonwealth v. Kozak*, 233 Pa. Super. 348, 336 A.2d 387 (1975) (warrantless search of suitcases by police after private search of airline employee was not unlawful even if police reopened suitcases for

purpose of confirming airline employee's suspicion that marijuana was contained therein).

Likewise, in the instant case, defendant was taken to an emergency room, where she was unable to talk due to her injuries. Medical personnel discovered that defendant had illegal drugs on her person, as well as in her fanny pack. They called the police and turned the fanny pack and the other drugs over to the police. The police unzipped the fanny pack and found precisely what they already knew was inside—illegal drugs. Defendant had no *legitimate* expectation of privacy in items that had already been discovered by a private individual and turned over to the police. Since the police in the instant case did not exceed the scope of the private search, no violation of defendant's fourth amendment rights occurred.

Additionally, in two separate arguments, defendant claims that there was no legal justification for the search of her wrecked 1989 Camaro, during which Krutsinger found two plastic bags with residue in them that contained amphetamines. We note parenthetically that this argument pertains only to defendant's conviction on count III of the information charging defendant with possession of amphetamines. Although defendant had two separate baggies in her vehicle that contained amphetamines, she was only charged in one count with possession of amphetamines. Since the charging instrument used the date of May 28, 1996, the date of the accident, as the date that defendant knowingly and unlawfully possessed the amphetamines, we will consider the discovery of the first bag of amphetamines as the charge that was properly before the jury.

On the date of the accident, Shehorn and Krutsinger arrived on the scene, and each entered defendant's vehicle, attempting to locate some identification for her. Since defendant's dentures had been shattered in the accident and she was confused and in pain, she was unable to give her name or any other personal information. In fact, her injuries were so serious that she was transferred to a hospital in St. Louis by helicopter that evening. Also, as we previously stated, her fanny pack, which contained her driver's license, was concealed under her shirt, so none of her personal identification was immediately available. During the time that Shehorn and Krutsinger were in defendant's vehicle, they discovered People's Exhibit 1. Neither Shehorn nor Krutsinger seized it at that time. It was seized later that same evening during an inventory search of defendant's vehicle.

■ The elements of an inventory search are as follows: (1) that the impoundment of the vehicle was lawful (*South Dakota v. Opperman*, 428 U.S. 364, 375-76, 49 L. Ed. 2d 1000, 1009, 96 S. Ct. 3092, 3100 (1976)), (2) that it was reasonable to inventory the contents of the ve-

hicle to protect them and to protect the police against false claims of loss (*Opperman*, 428 U.S. at 375-76, 49 L. Ed. 2d at 1009, 96 S. Ct. at 3100), and (3) that the inventory search was conducted according to a standard police policy. See *Colorado v. Bertine*, 479 U.S. 367, 93 L. Ed. 2d 739, 107 S. Ct. 738 (1987).

■ The initial discovery of People's exhibit 1 was proper because it was justified by exigent circumstances created by a medical emergency. See *People v. Paudel*, 244 Ill. App. 3d 931, 939, 613 N.E.2d 344, 350 (1993). The main justification, however, for the search of defendant's vehicle was that an inventory search was necessary due to the fact that the wrecked vehicle had to be towed to a police automobile pound. Since defendant's vehicle could not move on its own and there was no one on the scene to take responsibility for it, it had to be towed. If a vehicle is lawfully impounded by the police and police policy requires an inventory search of its contents, then evidence found during such an inventory search is admissible. See *Bertine*, 479 U.S. at 374, 93 L. Ed. 2d at 747, 107 S. Ct. at 742.

Krutsinger's inventory of defendant's vehicle was reasonable to protect the State Police from any claim or loss. In fact, the State Police had a written policy that required this type of inventory search. See *People v. Hundley*, 156 Ill. 2d 135, 137, 619 N.E.2d 744, 745 (1993) (Illinois Supreme Court upheld inventory search following accident by the same State Police general order involved here). Moreover, there is no evidence in the record to support defendant's suggestion that the inventory search was just a "fishing expedition." In fact, the record shows that Krutsinger inventoried other items of defendant's property that were not contraband. Because all three elements of a valid inventory search were present in the instant case, the recovery of the bag containing amphetamines at the scene of the accident was justified and was not a violation of defendant's fourth amendment rights.

For all of the foregoing reasons, we affirm defendant's convictions.

Affirmed.

WELCH and CHAPMAN, JJ., concur.