# Illinois Official Reports

## Appellate Court

*People v. Sykes*, 2017 IL App (1st) 150023

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LADINA SYKES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0023 |
| Filed<br>Rehearing denied | December 26, 2017<br>January 25, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 13-MC2-002513, YB-035582, YB-035583, YW-176395, YW-176396; the Hon. Jeffrey L. Warnick, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Roxanna A. Mason, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Leonore Carlson, Assistant State's Attorneys, of counsel), for the People. |

JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Neville and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Ladina Sykes and her two children were leaving a beach in Evanston when their car struck a wall in the parking lot. Paramedics took Sykes to Evanston Hospital, where she was arrested for driving under the influence of alcohol. Sykes was deemed mentally unable to provide consent, so when she refused to provide a doctor-ordered urine sample, a nurse catheterized her while several people, including two Evanston police officers, held her down because she was being physically uncooperative. Sykes was released from the hospital into police custody and charged with child endangerment, damage to property, and driving under the influence of alcohol. Sykes made a demand for trial. Several months later, after receiving the results of the urine test, which was positive for cannabis and phencyclidine (PCP), the State added two additional charges: driving under the influence of drugs and driving under the influence of cannabis.

¶ 2    Before trial, Sykes moved to suppress the results of the urine test, arguing the forcible catheterization was an unlawful search. The trial court denied the motion, finding the Evanston police officers' participation in the procedure was not an illegal search. The court also denied her motion to dismiss the DUI-cannabis counts on speedy-trial grounds, finding the new charges were not statutorily mandated to be joined with the original charges, as the State had no knowledge of them until receiving the urine test results. After a bench trial, Sykes was found guilty of child endangerment and driving under the influence of cannabis and sentenced to 18 months court supervision.

¶ 3    Sykes contends her conviction should be vacated because (i) the police violated her fourth amendment rights by holding her down while a nurse forcibly catheterized her and (ii) the State violated her right to a speedy trial by failing to bring her to trial on the DUI-cannabis charge within 160 days of her demand for trial.

¶ 4    We affirm. Although the better practice would have been for the police officers to refrain from restraining Sykes during the forced catheterization, their conduct did not transform the medical procedure, ordered and conducted by private actors, into state action. Further, Sykes's right to a speedy trial was not violated. The State was not required to join the DUI-cannabis charge with the original charges, as it did not know of the positive urine test until it received the results several months after Sykes's trial demand.

¶ 5                                    BACKGROUND

¶ 6    On the evening of August 19, 2013, Sykes and two of her children were swimming at a beach in Evanston. At about 10 p.m., the family left the beach and went to the parking lot. A few minutes later, a bystander saw Sykes's car drive into a wall. He found her unconscious, removed the key from the ignition, and called 911. When Evanston paramedics and police arrived, Sykes was conscious and had no visible injuries. Her speech was slurred, and she told

a paramedic she drank some alcohol. Evanston police officer Michael Pratt spoke to Sykes and smelled a slight odor of alcohol. He did not see any alcohol bottles or drugs on Sykes or in her car.

¶ 7    The paramedics took Sykes to Evanston Hospital, where a triage nurse assessed her condition. She was stable and had no complaints but was deemed to have an altered mental state because, even though she was alert and oriented as to person and place, she did not know the date or time of day. Officer Pratt told hospital staff he suspected Sykes was under the influence of something. Pratt was standing outside Sykes's room when he heard her tell the nurse she had one alcoholic drink that evening. He went in her room and asked her if she had been drinking. She told Pratt she had not been drinking or taking any drugs. Pratt arrested her for driving under the influence based on the odor of alcohol, slurred speech, bloodshot eyes, and overall demeanor. Pratt asked Sykes to provide blood and urine samples, and she declined. He did not ask hospital staff to obtain samples for him.

¶ 8    Dr. Patel examined Sykes and ordered a CT scan and blood and urine tests to determine why Sykes was in an altered mental state and to decide on a proper course of treatment. The urine test, in particular, would determine if she had drugs in her system. Colleen Costello, the supervising nurse, asked Sykes for a urine sample. Sykes refused. Costello then decided to catheterize her. Costello said patients can refuse treatment unless, like Sykes, they have an altered mental state. When Costello began the catheter procedure, Sykes was combative, swinging her arms, kicking her legs, and moving her hips to resist catheterization. She also tried to get out of the bed. Costello called for assistance, and about nine people responded, including Evanston police officers Pratt and Magnas, who had been standing outside the room. Pratt and Magnas stood at the head of the bed and held Sykes down by her shoulders. Once Sykes was restrained, Costello extracted the urine with a catheter. Afterward, Officer Pratt left the hospital and returned to the police station; Officer Magnas stayed with Sykes.

¶ 9    The blood and urine tests were sent to the hospital lab. Sykes's blood test showed she was well within the legal limit for alcohol, and her urine test was presumptively positive for cannabis and PCP, a reading later verified by a lab in Minnesota. Costello told Sykes about her test results. A police officer was standing outside Sykes's room at the time, but it is unclear whether the door was open or closed.

¶ 10    After Sykes's CT scan showed no evidence of injury and her mental state improved, Evanston Hospital discharged her into police custody. The State charged Sykes with endangering the life of a child (720 ILCS 5/12C-5(a) (West 2012)), driving under the influence of alcohol (625 ILCS 5/11-501(a)(2) (West 2012)), and damaging city property, under an Evanston ordinance. She was released on bail. On November 7, Sykes made a demand for trial, and the case was set for December 13. Sykes demanded trial again on December 13. The State informed the trial court it was waiting for Sykes's medical records from Evanston Hospital, and the case was continued to January 17, 2014, for trial on the State's motion. On January 17, Sykes again demanded trial. The State was not ready, and the case was continued to February 24. The State provided Sykes's medical records to the defense on February 24, and the parties agreed to a continuance to April 4.

¶ 11    On April 4, 2014, the State was granted leave to add two charges: driving under the influence of drugs (625 ILCS 5/11-501(a)(4) (West 2012)) and driving under the influence of cannabis (625 ILCS 5/11-501(a)(6) (West 2012)). Sykes objected to the new charges, but the trial court overruled the objection and set the case for a May 14 trial. On May 12, the trial court

granted Sykes's request that the case be taken off the trial call and be set for motions on June 17.

¶ 12    On May 30, Sykes moved to dismiss the two new charges, DUI-drugs and DUI-cannabis, on the grounds that they violated the speedy-trial statute (725 ILCS 5/103-5 (West 2012)), the Constitution of the United States (U.S. Const., amend. VI), and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). Sykes contended that the new charges arose from the original charges and the State was presumed to know the results of her urine and blood tests on August 20, 2013, when final results were generated by the Evanston Hospital lab. Relying on *People v. Williams*, 94 Ill. App. 3d 241 (1981), Sykes argued the new charges are subject to compulsory joinder with the original charges and that, because 229 days had passed since the original charges were brought, which exceeds the 160 days permitted by the Act, the new charges should be dismissed.

¶ 13    The State argued it subpoenaed Sykes's medical records but did not receive them until February 24, 2014, because Sykes used her maiden name, Moore, at the hospital instead of the name on her driver's license, Sykes, under which the police charged her. The State argued that the new charges were not statutorily mandated to be joined with the original charges, as the State had no knowledge of them when the case began. The trial court agreed, finding that neither the State's Attorney nor the police knew Sykes tested positive for cannabis until the State received the medical records. The trial court also found that Sykes should not have been surprised by the new charges, the State having repeatedly informed the court and defense counsel it was trying to obtain her urine and blood test results and the hospital having told Sykes she tested positive for cannabis and PCP.

¶ 14    Sykes also moved to quash the arrest and suppress the results of her blood and urine tests, asserting violations of her fourth amendment rights. Sykes argued that the Evanston police officers' participation in the forcible extraction of her blood and urine to test for drugs or alcohol, without a warrant, was an illegal search and the results of the search should be suppressed. Sykes also filed a motion *in limine*, arguing the results of the blood and urine tests are not admissible under section 11-501.4 of the Illinois Vehicle Code (625 ILCS 5/11-501.4 (West 2012)), as they were not conducted under the regular course of providing emergency medical treatment but obtained while she was restrained against her will.

¶ 15    After a hearing, the trial court denied the motion to suppress the blood and alcohol test results, finding that a doctor, rather than the police, had ordered the tests "in the normal course of medical treatment." Because Sykes was combative, the trial court found the hospital staff needed more help than they had on hand and invited the police officers to take part in restraining her for everyone's safety, including her own. The trial court concluded that the officers' actions, which were their only contacts with Sykes during the catheterization, did not turn a "medical procedure into an officer driven investigative search for evidence."

¶ 16    After a bench trial, the court found Sykes guilty of endangering the life and health of a child and driving under the influence of cannabis and acquitted her on the other charges. The trial court denied Sykes's motion to reconsider and sentenced her to 18 months' court supervision.

¶ 18                                    Motion to Suppress

¶ 19    Sykes first contends that the police violated her fourth amendment rights by actively participating in her forced catheterization. While Sykes concedes the police did not order the catheterization, she asserts they participated in an unconstitutional search by helping to hold her down while a nurse catheterized her. She contends that because the police did not have a warrant and no exceptions to the warrant requirement exist, the results of the urine test should have been suppressed. She also contends that without the test results, the State could not have proved her guilty of driving under the influence of cannabis or endangering the welfare of a child beyond a reasonable doubt, and thus, the supervision order should be vacated.

¶ 20    The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const., amend. IV; see *People v. James*, 163 Ill. 2d 302, 311 (1994) ("The principles of the fourth amendment are applicable to the States through the due[-]process clause of the fourteenth amendment ***."). "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Johnson*, 237 Ill. 2d 81, 89 (2010). Subject to a few exceptions, warrantless searches are *per se* unreasonable. *People v. Hyland*, 2012 IL App (1st) 110966, ¶ 22. We apply a two-part standard in reviewing the trial court's ruling on a motion to suppress evidence. On findings of fact and credibility assessments, we defer to the trial court and reverse only if its decision is against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). On the legal challenge to the trial court's ruling, we review *de novo*, and reverse only if the trial court improperly applied the law to the facts. *Id.*

¶ 21    Sykes argues that the withdrawal of urine through forced catheterization constitutes a search under the fourth amendment, which may be performed only with a warrant or if an exception to the warrant requirement applies. For support Sykes relies on *Schmerber v. California*, 384 U.S. 757, 767 (1966), which held that the withdrawal of blood to determine alcoholic content in connection with arrest for driving under the influence of intoxicating liquor constitutes a "search." She argues the results obtained through this warrantless search should have been suppressed, given the police did not obtain a warrant and none of the exceptions apply, including search incident to arrest, exigent circumstances, and "community caretaking."

¶ 22    We agree that, as with a blood draw, a forced catheterization by the police to determine if someone is under the influence of drugs constitutes a search under the fourth amendment. But, before addressing Sykes's contention regarding the exceptions to the warrant requirement, we must address the State's assertion that the catheterization did not constitute state action and, thus, did not violate the fourth amendment.

¶ 23    The fourth amendment applies only to government action. *People v. Phillips*, 215 Ill. 2d 554, 566 (2005). A search performed by a private person does not violate the fourth amendment. *Id.* Additionally, the fourth amendment does not prohibit the government from using information discovered by a private search. *Id.* The State argues the catheterization was ordered and conducted by private actors, namely Dr. Patel and nurse Costello, respectively. The State asserts that because Sykes was found in her car unconscious and arrived in the emergency room in an altered mental state, hospital staff determined the tests were medically

necessary. The State acknowledges Sykes could have withheld consent to either test had she been oriented as to time, place, and person.

¶ 24    The State relies on *People v. Radcliff*, 305 Ill. App. 3d 493 (1999), to support its argument that the officers' conduct was not state action. The defendant in *Radcliff* was seriously injured in a single car accident and transported to a hospital emergency room. *Id.* at 495. Nurses cut off the defendant's clothing and found drugs underneath her bra straps and in a fanny pack strapped around her waist. The hospital turned the items over to law enforcement, and the defendant was charged. *Id.* at 496-97. The defendant contended that the search of her clothing and fanny pack at the hospital was unlawful. *Id.* at 500. The *Radcliff* court found the defendant had no legitimate expectation of privacy in items that had already been discovered by a private individual and turned over to the police and, therefore, no violation of the defendant's fourth amendment rights occurred. *Id.* at 504.

¶ 25    The State argues that, as in *Radcliff*, Sykes's urine test was ordered and conducted by private individuals, Evanston Hospital employees, and not at the direction of law enforcement. Thus, the State asserts that the urine draw did not fall under the fourth amendment and is not subject to the exclusionary rule. The State also argues that cases Sykes cites to support a finding that the urine tests results should be excluded—including *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Schmerber*, 384 U.S. 757—involved blood tests ordered by the police and have no bearing, since the Evanston police neither ordered nor asked hospital staff to perform a urine test on Sykes.

¶ 26    Sykes argues the officers were state actors when they held her down while a nurse extracted urine for a test used as evidence against her. She focuses on the totality of the circumstances, including that Sykes was under arrest and not free to leave and the officers at the hospital continued to investigate possible charges. Sykes argues that unlike in *Radcliff*, where the police did not participate in the search of Radcliff's fanny pack, the Evanston officers did participate in the catheterization procedure. We disagree.

¶ 27    Nurse Costello testified that the treatment plan for Sykes, which included a CT scan and a blood test, in addition to the urine test, was ordered by Dr. Patel. Officer Pratt testified that, after arresting Sykes, he asked her to provide urine and blood samples and she declined. The evidence did not show that the police asked hospital staff to perform a urine test. Indeed, Costello testified that she never spoke to the police that night.

¶ 28    As for Sykes's contention that the police officers' participation in the catheterization procedure constituted state action, she cites no cases to support her argument. And indeed in *People v. Brooks*, 2017 IL 121413, which we allowed the State to cite as additional authority after oral arguments, our supreme court recently held that mere police participation, absent the private actors acting as an agent or instrumentality of the State, is not state action. In *Brooks*, the defendant, who was charged with driving under the influence of alcohol after crashing his motorcycle, moved to suppress the results of a blood-alcohol test performed at the hospital. *Id.* ¶ 1. The police officer who responded to the accident testified at the suppression hearing that the defendant appeared to have a broken leg but refused medical treatment. *Id.* ¶ 9. In response to a request from emergency service personnel, the officer helped remove the defendant from a car, placed him on a gurney, and put him in the ambulance. *Id.* ¶ 10. When the defendant tried to get out of ambulance, the officer handcuffed him to the gurney, rode with him to the hospital, and helped EMS personnel get him into the emergency room. *Id.* ¶ 12. At the hospital, the officer asked the defendant to consent to blood or breath testing, but he refused. *Id.* ¶ 13.

The officer issued a citation for DUI, but did not take a blood sample or ask anyone else to take a blood sample, and did not know if the defendant had consented to a blood draw. *Id.*

¶ 29 The trial court found that the blood draw violated the defendant's fourth amendment rights because there was " 'some apparent agency' " between the hospital and the officer, and therefore the State was responsible for the blood draw. *Id.* ¶ 17. The appellate court affirmed, finding the officer forced the defendant to receive medical treatment, despite his refusal, by helping emergency service workers get him on a gurney, into the ambulance, and to the hospital. *Id.* ¶19. Once at the hospital, the court found, "any hospital employee who drew defendant's blood necessarily did so under the guise of state action." *Id.* ¶ 32.

¶ 30 The supreme court reversed, finding the defendant failed to establish "that the private individual who conducted the alleged blood draw acted as an agent or instrumentality of the State when doing so." *Id.* ¶ 30. The court noted that " '[p]articipation by the police in and of itself *** does not automatically invoke the application of the guarantees against unreasonable government intrusions safeguarded by the fourth and fourteenth amendments.' " *Id.* ¶ 29 (quoting *People v. Heflin*, 71 Ill. 2d 525, 539-40 (1978)). The State argues that *Brooks* supports its contention that a police officer's mere involvement in a search does not establish state action absent evidence the officer ordered or brought about the search.

¶ 31 Sykes argues *Brooks* is distinguishable because the officer only brought the defendant to the hospital; he played no part in extracting blood and did not even know hospital staff was performing a blood test. Conversely, the Evanston police had Sykes in their custody, were actively investigating a crime, and participated in the search by holding her down to the bed during the procedure. We agree that *Brooks* is not directly analogous to the facts before us, primarily because the officer's involvement was far more circumscribed than the Evanston police officers' involvement. But Evanston Hospital staff did not perform the catheterization as the agents of the police. The test was ordered for medical purposes unrelated to any possible charges filed by the police. The fact that the officers were present, had placed Sykes under arrest, and were called on to assist did not turn the medical procedure into state action. They were in the room only because nurse Costello asked for their assistance restraining Sykes so that she not injure herself or others. The officers did not insist or even request they be permitted in the room during the procedure. A more compelling case for state action would involve the officers offering to hold Sykes down or insisting on being in the room in anticipation of obtaining test results that could be used to prosecute her. It was not unreasonable for the officers to come to the aid of a nurse seeking help with a patient who might harm herself and others.

¶ 32 Moreover, the catheterization was not dependent on the officers' participation. Nurse Costello testified that Dr. Patel ordered the urine test because Sykes presented with an altered mental state and might have had drugs in her system, which would influence her treatment. Costello, without input from the police, decided to obtain the urine by catheterization because Sykes was uncooperative and combative. The officers responded to Costello's request for help; there is no evidence in the record that but for the officers' presence, the catheterization procedure would have been abandoned. While the officers could have declined the nurse's request, their slight involvement did not turn the medical procedure ordered by private individuals into state action. Thus, the trial court did not err in denying her motion to suppress the results of her urine test.

¶ 33                                         Speedy Trial

¶ 34        Next, Sykes contends that the trial court erred in denying her motion to dismiss the DUI-cannabis charge due to a violation of the speedy-trial statute (725 ILCS 5/103-5 (West 2012)). Sykes asserts the State was obligated under the principal of compulsory joinder to bring her to trial on DUI-cannabis charge within 160 days of her demand for trial on the three original charges. Because the trial began on August 20, 2014, more than 160 days after her November 7, 2013, trial demand, she contends the DUI-cannabis charge should have been dismissed.

¶ 35        Criminal defendants possess both constitutional (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8) and statutory (725 ILCS 5/103-5 (West 2012)) rights to a speedy trial. Although these provisions address similar concerns, the statutory right and the constitutional right are not coextensive. *People v. Woodrum*, 223 Ill. 2d 286, 298 (2006). A trial court's factual findings on a speedy-trial claim are reviewed under a manifest weight of the evidence standard. But, a *de novo* standard of review is applied to determine if a defendant's statutory right to a speedy trial has been violated. *People v. Van Schoyck*, 232 Ill. 2d 330, 335 (2009). Sykes asserts solely a violation of her statutory right to a speedy trial and does not raise a constitutional issue.

¶ 36        Under the speedy-trial statute, a defendant released on bail must be tried within 160 days from the date he or she demands trial "unless delay is occasioned by the defendant." 725 ILCS 5/103-5(b) (West 2012). It is the State's duty to bring a defendant to trial within the statutory period, but, on a motion to dismiss, a defendant must affirmatively show his or her speedy-trial right was violated. *People v. Vasquez*, 311 Ill. App. 3d 291, 294 (2000). A defendant not tried within the statutory period must be released from his or her trial obligations and have the charges dismissed. 725 ILCS 5/103-5(d), 114-1(a)(1) (West 2012).

¶ 37        Calculating the speedy-trial period becomes more complicated when multiple charges are filed against a defendant at different times. Then, a court must decide whether to apply the compulsory-joinder rule. 720 ILCS 5/3-3 (West 2012). Under this rule, multiple charges against a defendant must be joined in a single prosecution if three conditions are satisfied: (i) the multiple charges are known to the prosecutor when the prosecution begins, (ii) the charges are within the jurisdiction of a single court, and (iii) the charges are based on the same act. 720 ILCS 5/3-3(b) (West 2012); *People v. Kazenko*, 2012 IL App (3d) 110529, ¶ 12. Generally, if none of the relevant facts are in dispute, the question of whether charges are subject to compulsory joinder is an issue of law subject to *de novo* review. See, *e.g.*, *People v. Hunter*, 2012 IL App (1st) 092681, ¶ 2 (using *de novo* review in similar situation). But when the parties' disagreement turns on the trial court's findings of fact, we will not reverse its ruling on a motion to dismiss absent an abuse of discretion. *People v. King*, 366 Ill. App. 3d 552, 554 (2006).

¶ 38        If the compulsory-joinder rule applies, the multiple charges are subject to the same speedy-trial period, which begins to run when the demand for trial is filed, even if some of the charges are brought at a later date. *People v. Phipps*, 238 Ill. 2d 54, 66 (2010). Thus, when the compulsory-joinder rule applies, the filing of a later charge does not give rise to a new, separate speedy-trial period relative to that charge. *Id.* " 'Continuances obtained in connection with the trial of the original charges cannot be attributed to defendants with respect to the new and additional charges because these new and additional charges were not before the court when those continuances were obtained.' " *Id.* (quoting *Williams*, 94 Ill. App. 3d at 249). In

other words, when the compulsory-joinder rule applies, a delay that occurs on the original charge and is attributable to defendant will not toll the speedy-trial period as to a later charge, if the delay occurred before the later charge was filed because the later charge was not before the court when the delay occurred. See *id.* In that situation, it cannot be assumed that the defendant would have agreed to the delay if the new charge had been pending. *Id.* at 67. The purpose of this rule, known as the *Williams* rule, is to prevent the defendant from being subject to a trial by ambush whereby the State could lull a defendant into a false sense of security on a lesser charge while actually preparing to file, and to go to trial on, a more serious charge. *Id.*

¶ 39 Sykes contends that compulsory joinder applies and the DUI-cannabis charge is subject to the same speedy-trial period as her original charges, which began to run when she first demanded trial in November 2013. She also asserts that because the DUI-cannabis charge was not pending when she agreed to a continuance after her demand on the original charges, that continuance cannot be attributed to her DUI-cannabis charge. And as more than 160 days elapsed between her original trial demand and the date trial began, the DUI-cannabis charge should have been dismissed on speedy-trial grounds.

¶ 40 Before addressing Sykes's second contention regarding the continuance, we must determine whether her case is subject to compulsory joinder. If not, she has no speedy-trial claim. The parties do not dispute that the charges were based on the same act. But, they disagree as to whether the State knew of Sykes's positive urine test for cannabis when it brought the initial charges. The State contends it was not aware of Sykes's positive test for cannabis until February 24, 2014, when it obtained her toxicology results. Thus, it was not required to join the new charges with the original charges. The State asserts that the delay in obtaining Sykes's medical records was attributable to her use of an "alias," namely her maiden name, Moore, at the hospital rather than Sykes, the name on her driver's license.

¶ 41 Sykes contends, however, that the State had sufficient information to charge her with DUI-cannabis, as Officer Pratt testified he had a suspicion at the hospital that Sykes might be under the influence of drugs. Further, she asserts, she did not mislead law enforcement regarding her last name and that the State could have found her medical records under "Moore." She argues that Officer Pratt was outside her room and likely heard the nurses refer to her by Moore and that a simple background check would have revealed that Moore was her maiden name.

¶ 42 "Knowledge" in context of section 3-3 is defined as "the conscious awareness of evidence that is sufficient to give the State a reasonable chance to secure a conviction." *People v. Luciano*, 2013 IL App (2d) 110792, ¶ 78. Officer Pratt testified "he had a suspicion" Sykes might be under the influence of drugs based on her demeanor and conduct toward hospital staff. But he did not see drugs in her car or find drugs in her possession. And although he also did not see any alcohol on her or in her car, Officer Pratt overheard Sykes tell a nurse she had a drink. He acknowledged he could only be certain that Sykes was under the influence of either alcohol or drugs after receiving the blood and urine tests results, but charged her with DUI-alcohol based on her slurred speech, bloodshot eyes, and the odor of alcohol when he spoke to her. Pratt's testimony that he had a "suspicion" Sykes might have been under the influence of drugs would not, without the results of the urine test, have been enough to give the State a reasonable chance to secure a conviction. Thus, we agree with the trial court's finding that the State did not have knowledge of her DUI-cannabis charge until it received the test results in February 2014.

¶ 43     The State's delay in acquiring Sykes's medical records was the result of an unfortunate, though common, clerical error for which neither party is to blame. As noted, the State subpoenaed her medical records using her married name, Sykes, which was on her driver's license and used by the police in charging her, rather than her maiden name, Moore, which she provided at the hospital. Sykes contends Officer Pratt knew her maiden name because he was standing outside her room, but the evidence does not support this contention. During the trial, Pratt testified he did not hear hospital staff refer to her as "Ladina Moore" and did not learn her maiden name until several months later, when he saw the state's attorney's paperwork.

¶ 44     Moreover, the State was not trying to "ambush" Sykes or surprise her by proceeding on lesser charges while secretly planning to go to trial on more serious charges. As the trial court noted, the State made plain it had subpoenaed and was awaiting Sykes's medical records, which, as Sykes had been informed at the hospital, included a urine test positive for cannabis and PCP. After the State received the medical records, it provided a copy to Sykes and filed the new charges at the next court date.

¶ 45     Because the DUI-cannabis charge was not subject to compulsory joinder, Sykes was not denied her right to a speedy trial.

¶ 46     Affirmed.