2024 IL App (1st) 221134-U

SECOND DIVISION
March 29, 2024

No. 1-22-1134

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 18 CR 962 (02) |
| | ) | |
| | ) | |
| NATRELL JACKSON, | ) | |
| | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

ORDER

¶ 1     *Held*: We affirm the trial court's judgment denying defendant's motion to dismiss the charges against him on the basis of a speedy trial violation; defendant is not entitled to plain error relief based on the trial court's refusal to offer an accomplice witness instruction to the jury; defendant's sentence is not excessive.

¶ 2     Defendant Natrell Jackson was charged with first-degree murder for the shooting death of Shari Graham, who was a bystander and not the intended target of the shooting. As the case was

preparing to go to trial, the State informed the trial judge on numerous occasions that it could not locate an essential trial witness, Semaja Weathersby. On the basis that it could not find Weathersby, the State used its power of *nolle prosequi* to dismiss the charges. Defendant was released from custody. The State subsequently filed a new indictment, and defendant was arrested a few months later in Iowa before being brought back to Illinois to face the murder charges in this case. Defendant moved to dismiss the charges against him arguing that the State improperly circumvented the speedy-trial period when it dismissed the charges against him and then refiled them. The trial court denied the motion to dismiss.

¶ 3    Defendant was tried by a jury. During the trial, Semaja Weathersby, one of the men who was with defendant at the time of the shooting, identified himself, defendant and the co-defendant in a surveillance video made during the commission of the offense. Defendant urged the trial court to instruct the jury that the testimony was the testimony of an accomplice and was subject to suspicion and should be considered with caution. The trial court rejected the instruction. Defendant was convicted by the jury of first-degree murder. The jury also made a special finding that defendant personally discharged a firearm during the commission of the murder. The trial court sentenced defendant to 35 years in prison. Defendant now appeals both his conviction and his sentence. We affirm.

¶ 4                                        BACKGROUND

¶ 5    On February 26, 2016, Shari Graham, her three children, and her boyfriend were visiting her boyfriend's mother at the Wentworth Gardens housing complex in Chicago. Graham left the residence to go and get dinner for the family at a nearby restaurant. She planned to take a taxi. As she was getting into the taxi, gunshots rang out. Graham got into the cab and told the taxi driver that she had been shot. Graham also called her boyfriend to tell him she had been shot.

¶ 6     The taxi driver started driving towards the hospital and, on the way there, he was able to flag down an ambulance that was stopped at a red light. The paramedics transferred Graham into the ambulance and assessed that she had been shot in the back. Graham was not breathing and did not have a pulse. She was taken to the hospital and pronounced dead. An autopsy revealed that the bullet entered Graham's back, traveled through her lung, and then entered the left ventricle of her heart, causing her death.

¶ 7     Patrick Curry was working as a security guard at Wentworth Gardens the night of Graham's death. He and his partner heard seven to eight gunshots, and they traveled in the direction of the gunfire. As they traveled towards the location of the gunshots, Curry observed defendant and another man exiting the back stairwell of 3801 S. Princeton Avenue. Curry knew defendant by sight because of his work as a security guard at Wentworth Gardens. Curry had also seen defendant the day before the shooting. When Curry saw defendant after the shooting, defendant was wearing a distinctive Pelle Pelle jacket and looked directly at Curry before running away. Curry's partner called the police. Chicago Police officers arrived and talked to witnesses, photographed the crime scene, and recovered a fired bullet and bullet casings.

¶ 8     Curry identified defendant in a photo array shortly after the shooting as the person he saw in the distinctive jacket coming out of the stairway after the shooting. Curry also identified defendant's co-defendant, Michael Whitehead, in a photo array, identifying Whitehead as a person he had seen in the area about an hour before the shooting.

¶ 9     Semaja Weathersby previously lived at Wentworth Gardens and grew up with defendant and Whitehead. Weathersby was socializing with defendant and Whitehead on the day of the shooting. Weathersby and defendant were smoking cannabis during the day, and they went to a

gas station to get some blunts. Weathersby acknowledged that it was he and defendant captured on the surveillance video together at the gas station around 6:30 p.m.

¶ 10    Three hours later, Weathersby, defendant, and Whitehead were hanging out in a courtyard at Wentworth Gardens, smoking a blunt. Weathersby acknowledged that it was the three of them captured on surveillance video together in the courtyard at that time. Weathersby saw two vehicles driving southbound on Princeton Avenue that caught his attention and he believed the people in the vehicles were rival gang members. Defendant and Whitehead ran towards Princeton, and Weathersby ran behind them. The surveillance video, which Weathersby viewed in open court and narrated, showed the subject vehicles driving southbound on Princeton Avenue and showed three men running to the street. The men stopped running and flashes of light appeared from where the men were standing.

¶ 11    At trial, Weathersby testified that he did not recall what defendant and Whitehead did after they ran towards the vehicles, saying that he just saw flashes. However, when he testified before the grand jury in this case, Weathersby testified that the three of them ran to Princeton Avenue and that defendant and Whitehead pulled out guns and began firing at a vehicle.

¶ 12    Defendant went to the gas station again after the shooting and was captured on surveillance video a second time. Defendant was wearing different clothes than he was in the first surveillance video, and, in this video, he was wearing the distinctive orange and blue Pelle Pelle jacket.

¶ 13    Twelve days after the shooting, on March 9, 2016, the police arrested Weathersby for an unrelated trespassing charge. After his arrest, investigators talked to him about the shooting where Shari Graham was killed. Weathersby identified defendant and Whitehead in separate photo arrays and indicated in writing on the identification forms that he knew defendant and

Whitehead well, that the three of them hung out on the night of the shooting, and that defendant and Whitehead were shooting guns that night—shooting at a car that drove past. Weathersby gave a video-recorded statement to an Assistant State's Attorney in which he stated that, after the two cars pulled up, defendant and Whitehead "started standing in the street, started shooting."

¶ 14    Surveillance video obtained from the Chicago Housing Authority showed three men in the courtyard behind 3801 S. Princeton Avenue. Another angle shows two vehicles driving southbound on Princeton Avenue and the three individuals running to the street. Two of the individuals go out into the street, while one of the men remains on the sidewalk. The two men standing in the street fire numerous shots in the direction of the vehicles, and then the three men all run back around to the rear of 3801 N. Princeton and enter the building. It was that same building that Curry observed defendant exiting when he arrived near the scene of the shooting.

¶ 15    Detective James Carroll recovered the surveillance video from the CHA and the gas station, and he showed still-frame photographs from the video to Officer David Carey, who was familiar with Wentworth Gardens because it was his assigned territory. Officer Carey confirmed to Detective Carroll the identities of defendant and Weathersby on the gas station video. Officer Carey noticed that defendant was wearing a distinctive Pelle Pelle jacket in the photographs taken from the video, and he took note of defendant's attire because Carey was familiar with Pelle Pelle jackets and had never seen two jackets with the same pattern. After confirming the identity of the two men and knowing that they were together on the day of the shooting, Detective Carroll spoke with Weathersby to find out more about the shooting. Detective Carroll did not view Weathersby as a suspect at the time of speaking to him because the detective had watched the video and seen Weathersby was not one of the shooters. Forensic analysis of the ballistics evidence showed that the cartridges recovered at the scene were fired from only two

weapons—seven of the cartridge cases that were recovered were from bullets fired from one firearm, while five of the recovered cartridge cases were from bullets fired from a second firearm.

¶ 16    Defendant and Whitehead were arrested on March 10, 2016. Defendant was 18 years old at the time of the murder. The day after defendant's arrest, detectives went to his home to interview his mother, and they asked her to produce defendant's orange and blue Pelle Pelle jacket. Defendant's mom gave the jacket to the detectives. On April 15, 2016, defendant was charged by indictment with first-degree murder for killing Shari Graham. A trial date was set for August 21, 2017. On the trial date, defendant answered ready, but the State asked for a continuance because a witness, Weathersby, had not been served and was not present for the trial. Defendant demanded trial. The trial court granted the State's motion for a continuance. At court appearances on October 10th and 13th, the State asked for further continuances. At the October 20, 2017 court appearance, the State informed the trial court that the State had spent "hundreds of man hours" trying to locate the witness, Semaja Weathersby. The State represented that it had utilized both the State's Attorney's Office investigators as well as the Chicago Police Department to try to locate Weathersby. The State indicated it was still unable at that time to locate Weathersby and had not served him with a subpoena. More than three weeks remained in the speedy-trial period as of the October 20th court appearance, but the State moved for *nolle prosequi*. Defendant demanded trial again. The trial judge informed defendant that the charges against him had been dropped by the State, but that the charges could still be reinstated. Defendant was released from custody.

¶ 17    On the same day defendant was released from custody, a new grand jury investigation into the murder began. The State filed a new indictment against defendant, and defendant was

indicted again by the grand jury for Graham's murder. A warrant was issued for defendant's arrest on January 11, 2018. Defendant was located and arrested in Iowa on April 12, 2018, and was transferred back to Illinois to face these murder charges.

¶ 18    Defendant filed a motion to dismiss the charges against him, arguing that the State violated his right to a speedy trial. Defendant argued that the State misused its power of *nolle prosequi* to gain a tactical advantage in the case. As evidence of the alleged gamesmanship, defendant highlighted the fact that the State was able to serve Weathersby on October 23, 2017, which was just three days after a grand jury issued a subpoena for Weathersby to appear.

¶ 19    The State recounted that it informed the trial court that it believed the missing witness was aware of the court dates and was being uncooperative. The State had to move for continuances because, despite its efforts of searching for Weathersby by contacting his family and friends and conducting extensive searches on social media, it could not locate him. The State represented that its investigators made numerous visits to Weathersby's listed address and to the addresses of family members who lived in other places. The Assistant State's Attorney informed the trial court that she even spent a half hour on the phone with Weathersby's mother who stated that she had kicked Weathersby out of the house and that he did not live with her anymore. After the State exercised its power of *nolle prosequi* in defendant's case, the State found Weathersby outside of his mother's house. The State concluded that it was able to locate and serve Weathersby at that time because the charges against defendant and his co-defendant were dismissed and Weathersby believed he no longer needed to evade the State. Weathersby told the investigator who eventually located him, "I'm not coming to court. I don't have to come to court. I have a lawyer." Weathersby made good on his word and failed to appear before the grand jury that had summoned him. A warrant was issued for Weathersby's arrest, and he was located and

arrested on the outstanding warrant on January 9, 2018. The new indictment against defendant was filed the following day, on January 10, 2018.

¶ 20    The trial court held a hearing on defendant's motion to dismiss the case on speedy-trial grounds. At the conclusion of the hearing, the trial court made certain findings and concluded that the State had a good-faith basis for dismissing the charges against defendant thereby tolling the speedy-trial term. The trial court found Weathersby to be a material witness. The trial court explained that it accepted the State's contention as logical and understandable that Weathersby was easily served after the charges against defendant and his co-defendant were dismissed because Weathersby decided he could go back home—when Weathersby stopped fearing the prosecution was searching for him. The trial court explained that the State did not do anything manipulative by dismissing the charges, and the court explained that it truly believed the State could not find Weathersby until the time that it did find him.

¶ 21    The trial court noted its own observation that Weathersby was not happy about being involved in the case and was being kept on electronic monitoring to ensure his appearance as a witness. Ultimately, the trial court explained that it did not think the State was acting in bad faith, but rather, the State was doing what it needed to do under the circumstances. The trial court stated that the problem underlying the ability to get defendant to trial was the State having a problem finding the necessary witness. The trial court further explained that defendant was not prejudiced by the way the prosecution was handled.

¶ 22    The case proceeded to a jury trial where the testimony was consistent with the facts set forth above. Following the trial testimony, the trial court held a jury instruction conference. Defendant requested that the jury be instructed with "the accomplice-witness jury instruction." Defendant argued that Weathersby could have been charged with the murder in this case, so the

jury needed to be instructed to exercise caution in analyzing Weathersby's testimony. The trial court denied defendant's request for the proposed instruction but allowed defendant to argue its accomplice theory to the jury during closing argument. The trial court explained that the testimony showed that Weathersby was never a suspect in the murder and was only ever looked at by the police as a witness.

¶ 23    The jury found defendant guilty of first-degree murder. The jury also found that defendant personally discharged a firearm during the commission of the offense.

¶ 24    Before sentencing, defendant filed with the court psychiatric, psychological, and academic evaluations, as well as other records of his social history and academic performance totaling more than 300 pages to assert that his brain development was more like a juvenile than an adult at the time of committing the murder. Defendant was 18 years old at the time of the offense. Among other things, the records show that defendant had a learning disability and consistently scored low on academic evaluations. One of the psychiatric evaluations performed when defendant was 17 years old showed that, at that time, defendant was immature for his age.

¶ 25    The trial court decided, based on defendant's youth and reports from a doctor who examined defendant, that it was not appropriate to apply the firearm sentencing enhancement to defendant's sentence. After hearing arguments in aggravation and mitigation, the trial court concluded a 35-year prison sentence was appropriate for defendant.

¶ 26    In reaching its sentence, the trial court specified that it was sentencing defendant without the firearm enhancement based on defendant's age and individual characteristics and that another person might not obtain the same results. The court discussed that defendant and his co-defendant, Whitehead, were different not just in their age but also in their backgrounds and their behavior. The trial court also noted, however, that defendant murdered a woman, an innocent

bystander, and it was a crime that never should have happened. The trial court characterized the crime in this case as "tragic beyond belief." The trial court explained that during its multiple years presiding over the case it got the sense that defendant is "something of a danger to the community," and the trial court noted it needed to consider the safety of the public when fashioning a sentence. Finally, the trial court explained that it had "considered all of this at great length" before concluding that a 35-year prison sentence was appropriate for defendant.

¶ 27    Defendant now appeals both his conviction and sentence.

¶ 28                                    ANALYSIS

¶ 29    Defendant makes three primary arguments on appeal: (1) the charges against him are subject to dismissal for violating his right to a speedy trial; (2) he was denied a fair trial when the trial court refused to give the jury instruction for an accomplice witness; and (3) his 35-year prison sentence is excessive.

¶ 30    *Speedy Trial*

¶ 31    Defendant argues that the charges against him should have been dismissed for an alleged violation of his right to a speedy trial. In Illinois, a defendant possesses both a state and federal constitutional right, along with a statutory right, to a speedy trial. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; 725 ILCS 5/103-5 (West 2022). Defendant bases his claim only on the Illinois statutory right. By statute in Illinois, any person accused of a crime has the right to stand trial in a prompt fashion.

> "Every person in custody in this State for an alleged offense shall be tried by the
> court having jurisdiction within 120 days from the date he or she was taken into
> custody unless delay is occasioned by the defendant. *** The 120-day term must
> be one continuous period of incarceration. In computing the 120-day term,

separate periods of incarceration may not be combined. If a defendant is taken into custody a second (or subsequent) time for the same offense, the term will begin again at day zero." 725 ILCS 5/103-5(a) (West 2022).

¶ 32     The right to a speedy trial is designed to: (1) prevent oppressive pretrial incarceration; (2) minimize the accused's anxiety and concern; and (3) limit the possibility that the defense might be impaired. *People v. Decatur*, 191 Ill. App. 3d 1034, 1039-40 (1989). During the pretrial period, the State has the right to dismiss the charges and then later re-charge the defendant under the appropriate circumstances. See *People v. Klein*, 393 Ill. App. 3d 536, 545 (2009). However, the State may not use its power of *nolle prosequi* to unfairly circumvent a defendant's right to a speedy trial. *People v. Van Schoyck*, 232 Ill. 2d 330, 335 (2009).

¶ 33     The State has absolute power to request a *nolle prosequi*, so such a dismissal requires scrutiny to determine whether the State is abusing its dismissal power and whether the refiling is vexatious, repetitious, or employed to manipulate the proceedings in order to evade or frustrate the purpose of the speedy-trial statute. *Decatur*, 191 Ill. App. 3d at 1038. Allowing a *nolle prosequi* to toll the speedy-trial statute, absent a showing of bad faith, enables the State to meet its dual obligations: (1) to prosecute the case in a timely manner so as to honor the protections afforded to the defendant by his right to a speedy trial; and (2) to prosecute violations of law so as to protect the citizenry. *Id.* at 1039.

¶ 34     The parties disagree about what standard of review we should employ to address defendant's claim. Defendant argues that the standard of review should be *de novo* because whether the statute was violated is a question of law (citing *Van Schoyck*, 232 Ill. 2d at 335). The State argues that the standard of review should be two-fold: (1) the manifest weight of the evidence standard to review the question of whether the State exercised bad faith; and (2) the

abuse of discretion standard to review whether the dismissal of the charges tolled the speedy-trial term (citing *People v. Weddell*, 405 Ill. App. 3d 424, 437 (2010)).

¶ 35    In this case, we are not presented with a pure question of law. The issue in this case is a determination of whether the trial court erred when it ruled that the State did not operate in bad faith when it dismissed the charges, *i.e.*, ruled that the State did not manipulate the proceedings to evade defendant's right to a speedy trial. Under such circumstances, "[w]hether the State acted to evade the speedy-trial term or otherwise gain a tactical advantage over defendant is a factual issue." *Weddell*, 405 Ill. App. 3d at 435.

¶ 36    Both defendant and the State submitted factual matters to the trial court that required resolution before the trial court could rule on the speedy-trial question. The trial court was in a superior position to observe the parties during the hearing on the motion to dismiss and to apply its sense of the veracity of the statements based on its familiarity and history with the case. Some deference must be afforded to the trial court's rulings under such circumstances. Thus, we follow the line of cases which hold that "[a] trial court's factual findings on a speedy-trial claim are reviewed under a manifest weight of the evidence standard [and the] *de novo* standard of review is applied to determine if a defendant's statutory right to a speedy trial has been violated." See *People v. Sykes*, 2017 IL App (1st) 150023, ¶ 35; *People v. McBride*, 2022 IL App (4th) 220301, ¶ 28. This bifurcated standard of review has long applied to constitutional speedy-trial claims (*People v. Crane*, 195 Ill. 2d 42, 51 (2001)) and we find it to be appropriate under the circumstances in this case.

¶ 37    Moving to the merits of defendant's claim, Illinois courts have held that the unavailability of a witness is a valid reason to voluntarily dismiss a case, which, in turn, tolls the speedy-trial term. See *Klein,* 393 Ill. App. 3d at 545 (citing, *e.g.*, *People v. Martin,* 183 Ill. App. 3d 442, 444

(1989); *People v. Stinnett,* 166 Ill. App. 3d 1027, 1028 (1988)). In order for the tolling effect of the *nolle prosequi* to be inoperative, there must be a "clear showing" that the State dismissed the charges to gain some tactical advantage over the defendant or to otherwise harass or prejudice the defendant so as to avoid or frustrate the interests that the speedy-trial right was designed to protect. *Decatur,* 191 Ill. App. 3d at 1039. Defendant bears the burden of affirmatively establishing a violation of the speedy-trial statute. *People v. Kliner*, 185 Ill. 2d 81, 114 (1998).

¶ 38    Defendant argues that he made a "clear showing" that the State's use of *nolle prosequi* in this case was used to circumvent his speedy-trial term. He contends that the State's supposed inability to locate a witness was a pretense because the record demonstrates the State *could* locate the witness. Defendant points out that at a court appearance where there was three weeks left in the speedy-trial term, the trial court asked the State if it wanted to use the remainder of the speedy-trial period to locate the witness. The State declined and instead exercised its power of *nolle prosequi*. Defendant further points out that, after a new grand jury investigation began, a subpoena was issued on October 20, 2017 for Weathersby to appear, and Weathersby was served within three days on October 23, 2017. Defendant argues that the ability to quickly serve the grand jury subpoena demonstrates that Weathersby was not difficult to find, and the quick service belies the representations the State made to the trial court. Defendant contends that the State engaged in precisely the sort of impermissible technical maneuvering to avoid the speedy-trial period such that we should hold the speedy-trial period was never tolled, that it lapsed, and that his charges should have been dismissed.

¶ 39    Defendant does not suggest what benefit the State would have received by misrepresenting Weathersby's unavailability. For example, at three separate court appearances when there was roughly a month remaining in the speedy-trial term, the State consistently

asserted it could not locate Weathersby. The State represented that both the State's Attorney's Office investigators and Chicago Police Department personnel had been searching for Weathersby expending hundreds of hours in the search. We see no benefit the State would receive by lying to the court, dismissing the charges against defendant, and setting defendant free from custody only to start the same process again. Rather, the evidence and the trial court's observations demonstrate that Weathersby was an extremely reluctant witness.

¶ 40      The trial court expressly found that the State was not manipulating the proceedings by lying about its ability to locate Weathersby in some undefined effort to prejudice defendant. The trial court stated that defendant's contention "makes zero sense to me at all. I don't believe at all that that's what happened. I believe from everything that I have before me that they couldn't find the witness, until they did find him." The trial court was entitled to credit the State's representations about its efforts to locate Weathersby and to reject defendant's assertions that the State was fabricating its efforts. At the hearing on the motion to dismiss, the State submitted that it contacted Weathersby's family and friends, conducted extensive searches on social media, made numerous visits to his listed address, and visited the addresses of family members who lived in other places. The State further submitted that it spent a half hour on the phone with Weathersby's mother who falsely stated that she had kicked Weathersby out of the house, and he did not live with her anymore. The trial court's conclusion that the State was able to serve Weathersby quickly after the charges were dropped because Weathersby felt comfortable and stopped evading service is a reasonable one. The trial court had the opportunity to observe the State and the defense at numerous court appearances in which the State represented it could not locate Weathersby. The trial court was not required to accept defendant's theory that, since Weathersby was served fairly easily with the grand jury subpoena, "the State had apparently not

14

made a good faith effort before." Defendant has not made a clear showing that the State sought *nolle prosequi* for the purpose of evading the speedy-trial requirements. None of the trial court's findings or credibility determinations are against the manifest weight of the evidence and we find its conclusion that the State did not violate defendant's right to a speedy trial is correct and consistent with the controlling law.

¶ 41    *Jury Instruction*

¶ 42    Defendant argues that he was denied a fair trial when the trial court refused to instruct the jury with the jury instruction for accomplice witnesses. The "Testimony Of An Accomplice" instruction provides that: "[w]hen a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." IPI Criminal 3.17. The underlying rationale reflected in the pattern instruction "is that it is fair to question the testimony of a witness who has admittedly participated in the crime at issue in the proceedings." *People v. Fane*, 2021 IL 126715, ¶¶ 35-36. Defendant raised this issue during the jury instruction conference, but he concedes he did not raise the issue in a posttrial motion. Defendant, therefore, urges us to review the issue under the plain error doctrine. If a defendant either fails to object to an error at trial or fails to raise the issue in a posttrial motion, the issue is forfeited for appellate review. *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). An exception to the forfeiture rule exists for situations in which the alleged error rises to the level of "plain error." *People v. Roman*, 2013 IL App (1st) 102853, ¶ 19. Under plain error review, we will grant relief to a defendant on otherwise-forfeited issues in either of two circumstances: (1) if the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) if the error is so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 178–79 (2005). Defendant argues he is entitled to relief under both prongs of the plain error doctrine.

¶ 43    Where a defendant alleges first-prong plain error, a court of review may first examine the record to determine whether the evidence is closely balanced before determining whether error occurred. *People v. White*, 2011 IL 109689, ¶ 148. "When it is clear that the alleged error would not have affected the outcome of the case, a court of review need not engage in the meaningless endeavor of determining whether error occurred." *Id.*

¶ 44    In this case, the evidence against defendant was overwhelming. Even setting aside the damning testimony from Weathersby for the moment, Patrick Curry, the security guard, saw defendant just after the shooting exiting a stairwell in the direction from which Curry heard the gunshots. Defendant was wearing a distinctive Pelle Pelle jacket and looked directly at Curry before running away. Curry knew defendant well and testified clearly that it was defendant he saw. Curry identified defendant in a photo array soon after the murder.

¶ 45    The whole shooting incident was captured on surveillance video. After the shots were fired, the surveillance video shows that defendant and the other men ran inside the building at 3801 S. Princeton Avenue. Curry saw defendant and another man running out the back stairwell of the building at 3801 S. Princeton Avenue when he arrived at the scene. He clearly saw defendant's face. Piecing together the surveillance video and Curry's testimony provides strong evidence against defendant.

¶ 46    After the shooting, defendant was captured on gas station surveillance video wearing the same distinctive Pelle Pelle jacket he was seen wearing by Curry as he fled from the area of the shooting. Officer Carey, whose territory included Wentworth Gardens, was able to identify

defendant by sight from the gas station surveillance video. The day after defendant's arrest, detectives went to defendant's home to interview his mother, and they asked her for his orange and blue Pelle Pelle jacket. Defendant's mom gave the jacket to the detectives. All of this evidence strongly implicated defendant in Graham's murder. Add Weathersby's testimony back into the mix and there was overwhelming evidence of defendant's guilt offered at trial. The evidence was not closely balanced, and defendant is not entitled to first-prong plain error relief.

¶ 47    Under the second prong of the plain error doctrine, we may address unpreserved errors that undermine the integrity and reputation of the judicial process regardless of the strength of the evidence or the effect of the error on the trial outcome. *People v. Jackson*, 2022 IL 127256, ¶ 24. The plain error rule itself, however, is "a narrow and limited exception" to procedural default, and the errors that fall under the purview of the second prong of the plain error rule are rare. *Id*. at ¶ 27.

¶ 48    Defendant argues that second-prong plain error relief is warranted "because the failure to instruct the jury regarding how to evaluate [Weathersby's] [sic] credibility deprived [defendant] of his due process right to a fair trial." We do not find the trial court's discretionary decision to decline to give an accomplice jury instruction in this case to be an error. "If the witness could not be indicted for the offense then he is not an accomplice. An accomplice must knowingly, voluntarily, and with common interest unite with the principal offender in the commission of the crime." *People v. Travis*, 94 Ill. App. 3d 983, 991 (1981). At the jury instruction conference, defendant requested the "Testimony Of An Accomplice" pattern jury instruction—IPI Criminal 3.17. The first part of the instruction at issue provides that "[w]hen a witness *says he was involved in the commission of a crime* with the defendant ***." Weathersby and the State never said Weathersby was involved in the commission of a crime along with defendant.

¶ 49     There was no evidence or even a suggestion at trial that Weathersby committed any crime. After hearing argument from the parties on the propriety of giving the instruction, the trial court concluded that Weathersby was not "an accomplice." The trial court did, however, allow defendant to argue throughout trial that Weathersby should not be believed because he was being granted immunity from the State and was present at the scene of the shooting. Nonetheless, Weathersby testified consistently that he had no idea defendant and Whitehead were going to shoot anyone. He did not even know they had guns. The surveillance video somewhat corroborates this testimony, or at least it shows that Weathersby was standing back away from defendant and Whitehead, and only defendant and Whitehead pulled out guns and started shooting. The detective similarly testified that he never viewed Weathersby as a suspect in the murder and always viewed him only as a witness. The trial court considered the arguments of the parties on the issue and made a thoughtful determination to reject giving the instruction. "The refusal of an accomplice instruction will not be overturned on appeal unless it represents an abuse of discretion." *People v. Harris*, 182 Ill. 2d 114, 144 (1998). Abuse of discretion is a highly deferential standard of review, and we will find such abuse only when the trial court's decision is arbitrary, fanciful, or unreasonable to such a degree that no reasonable person would agree with it. *People v. Lerma*, 2016 IL 118496, ¶ 32. We cannot say that no reasonable judge would agree with the judge's decision or that the decision was arbitrary or fanciful. Therefore, the trial court's decision did not amount to an abuse of discretion, and it has support in Illinois caselaw. See *e.g.*, *Harris*, 182 Ill. 2d at 145 ("There was no probable cause in the present case to believe that [the witness] was guilty of these offenses either as a principal or under an accountability theory, and therefore the trial judge did not abuse his discretion in refusing to give

the jury an accomplice instruction for [the witness's] testimony."). As we find no clear and obvious error, defendant is not entitled to second-prong plain error relief.

¶ 50    Defendant argues that his trial counsel's failure to include the jury-instruction issue in his posttrial motion constitutes ineffective assistance of counsel. However, the existence of prejudice is a fundamental part of an ineffective assistance of counsel claim. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice in an ineffective assistance of counsel claim, a defendant must show a "reasonable probability" that the result of the proceeding would have been different but for counsel's supposed error. *Id*. at 693. Here, as explained above, the evidence of defendant's guilt was overwhelming, and he cannot show any prejudice from counsel's alleged error concerning the jury instruction. See *supra* ¶¶ 44-46.

¶ 51    *Sentencing*

¶ 52    Defendant argues that his 35-year prison sentence is excessive. Defendant was 18 years old at the time he committed the murder in this case. Defendant argues that his young age and his "demonstrated history of cognitive delays" combined with his potential for rehabilitation show that the trial court abused its discretion when it sentenced him to 15 years imprisonment above the minimum sentence. Defendant urges us to reduce his sentence or remand the case for a new sentencing hearing.

¶ 53    At the sentencing hearing, the State pointed out that defendant had a prior conviction for unlawful use of a firearm wherein defendant discharged a firearm in a park. The trial court also explained that during its multiple years presiding over the case it got the sense that defendant is "something of a danger to the community," and the trial court noted it needed to consider the safety of the public when fashioning a sentence. Of course, the circumstances of this case were, as the trial court described it, "tragic beyond belief." Defendant killed a young mother who had

three young children. Graham merely happened to be in the wrong place at the wrong time where she was caught on the wrong end of defendant's violent actions.

¶ 54    The Illinois Constitution requires that all sentences "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. (1970) art. I, § 11; 730 ILCS 5/1-1-2 (West 2022). When the trial court sentences defendant to a term within the range prescribed by the General Assembly, the sentence is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 47. A sentence is deemed excessive and represents an abuse of discretion only where it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007).

¶ 55    The sentencing judge is given great discretion in determining a sentence within the limits set by the legislature by statute. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). A sentencing decision by the trial court is accorded great deference and weight because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). The trial court has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id.*

¶ 56    In arguing that the sentence was excessive, defendant points out the "overwhelming amount of mitigating evidence presented by the defense demonstrat[ing that he had] developmental delays which significantly reduced his age when measured by brain maturity." Defendant recounts the evidence of learning disabilities and developmental delays in his brief on appeal which the trial court found to be fairly persuasive. To summarize the point, defendant concludes that his "intellectual development shows a consistent lag behind his peers, meaning

that at the time of the offense, at age 18, he was more immature than his peers." Defendant also points out though that once he was in a structured environment in jail, he earned his GED while this case was pending. Defendant argues that the trial court gave this mitigating evidence "short shrift."

¶ 57    Quite to the contrary, the trial court gave significant attention to defendant's youthful age, his history of learning disabilities, and the disadvantages of his childhood. The trial court considered those factors to be compelling, such that it chose not to apply the *mandatory* firearm sentencing enhancement even though the jury had made a special finding that defendant personally discharged a firearm during the commission of the murder. The trial court explained that it had "considered all of this at great length" before concluding that a 35-year prison sentence was appropriate for defendant.

¶ 58    The Illinois Supreme Court recently held that the statutory firearm enhancements are only discretionary as to individuals who were juveniles at the time of the offense, but for an adult like defendant, the statutory sentencing enhancements are mandatory. *People v. Hilliard*, 2023 IL 128186, ¶ 39. Nonetheless, defendant was sentenced before *Hilliard* was decided and the trial court gave defendant a major benefit by not applying the sentencing enhancement. Defendant was actually subject to a mandatory 40-year minimum sentence: 20 years for the firearm enhancement and 20 years minimum for first-degree murder. See 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2022) (firearm enhancement); 730 ILCS 5/5-4.5-20(a)(1) (West 2022) (sentencing range for first-degree murder). The trial court chose to forego the firearm enhancement in defendant's favor over the State's objection due specifically to defendant's young age, his childhood learning difficulties, and other unfortunate circumstances in his upbringing. Defendant, therefore, actually ended up receiving a sentence of five years less than the minimum allowable by statute. In his

reply brief, defendant seems to acknowledge this fact and essentially abandons his argument that the trial court abused its discretion when fashioning his sentence. Whether defendant abandoned the issue or not, we would hold that defendant's sentence is not excessive and would reject his challenge to his sentence.

¶ 59                                    CONCLUSION

¶ 60    Accordingly, we affirm.

¶ 61    Affirmed.